# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

v.                            Case No.: 8:22-cr-00169-SDM-TGW

JESSE JAMES BERTETTO,
    Defendant.
_____/

## SENTENCING MEMORANDUM

Jesse James Bertetto, through his undersigned counsel, respectfully moves this Honorable Court for the imposition of a sentence that is significantly below his applicable sentencing guidelines as calculated by the Court, followed by an appropriate term of supervised release. Under the facts and circumstances of this case, such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing. As grounds in support thereof, Mr. Bertetto states the following:

**I.    This case involves Mr. Bertetto's possession and receipt of child sexual abuse material (CSAM).**

Mr. Bertetto's offense conduct is described within the Presentence Investigation Report (PSR). Doc. 116. In summary, law enforcement conducted an undercover investigation into the sharing of CSAM using Kik, an instant messaging mobile application. The individual utilized multiple IP addresses to upload multiple videos of child pornography. In the course of the investigation,

cellular phones belonging to the defendant were seized and search warrants were executed. A forensic examination of Mr. Bertetto's cellular phones revealed that they contained numerous images of child pornography and approximately 25 videos of child pornography. The full scope of the details of the information seized from various sources are contained in the PSR report in sections 10 through 21.

## II. The United States Sentencing Commission provides for recommended areas of focus in sentencing non-production child pornography offenders.

In June 2021, the United States Sentencing Commission (USSC) published its report, *Federal Sentencing of Child Pornography: Non-Production Offenses* ("USSC's Report").[1] Of specific relevance to the sentencing considerations in this case is the USSC's examination of the three primary areas of focus in sentencing non-production CSAM offenders: (1) content; (2) community; and (3) conduct. The conclusions from the USSC's Report are contained in this memorandum and will be discussed herein as they apply to this case.

## III. Mr. Bertetto's post arrest conduct supports his candidacy for rehabilitation.

---

[1] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf (last visited September 8, 2023).

Mr. Bertetto was arrested for the instant offenses on May 11, 2022. At a subsequent detention hearing on May 17, 2022, he was released on a $50,000 unsecured bond with pretrial services supervision. The conditions of release included the standard conditions of release, and conditions that included no contact with potential witnesses or victims and special conditions to submit to a mental health evaluation and to follow up with whatever treatment was recommended.

Additionally, Mr. Bertetto was ordered to not possess any firearms or dangerous weapons, to not obtain a passport, to seek/maintain employment, to not possess a computer or any electronic devices capable of accessing the internet, to have supervised contact with all children under the age of 18, to inform all residents of his charges and the conditions of his release, as well as participating in the Location Monitoring Program on Home Detention with GPS monitoring. Mr. Bertetto has complied with all of these special conditions in an exemplary manner from the time of his post arrest release until his trial on April 12, 2023 concluded, and continuing until today's date. Other than a few minor communication glitches at the early stage of his pretrial release, Mr. Bertetto has faithfully followed all of these conditions and within the constraints of the Court's pretrial release Order, has led a law-abiding life with no new arrests or warrants. Of particular significance is Mr. Bertetto's dutiful

compliance with the mental health treatment aspects of his pretrial release. The probation office reports that Mr. Bertetto completed the requirement for a mental health evaluation in June 2022 with Lawrence Benes, and that he also has been consistent in his individual counseling. Mr. Bertetto's counselor has indicated that there had been no significant issues or concerns regarding the defendant's treatment. While Mr. Bertetto originally met with Mr. Benes once a week, after active progress, Mr. Bertetto's therapy progressed to bi-weekly meetings. Mr. Benes has addressed specific issues pertaining to post traumatic stress disorder, as well as modalities to utilize to avoid situations such as those alleged to have occurred in this case and Mr. Benes feels the therapy has been a positive force in enabling the defendant to maintain the structure in his life necessary to have achieved his compliance with the pretrial conditions of release. Mr. Benes further opined that the defendant would be amenable to intensive sexual offender treatment, so long as that treatment did not require a specific admission to the offenses for which Mr. Bertetto has been convicted.

## IV. Section 3553(a)(1) - The nature and circumstances of the offense and the history and characteristics.

Jesse Bertetto should be considered for a downward variance. His personal history is such that when viewed in contrast with other offender characteristics, it distinguishes the case from typical cases covered by the guidelines. While the PSR does include this ground in PSR, ¶ 112, as a factor

that may warrant a sentence outside of the advisory guideline system, citing the need to provide restitution to any victims of the offense, and the history and characteristics of the defendant, and the defendants history of foster care placement and childhood abuse, Mr. Bertetto's particular circumstances warrant an unusual level of consideration. Even under a cursory review of his circumstances, he has been a victim of abuse and family dysfunctionality that defines his entire childhood. By the age of 4 or 5 years old, there is documentation evidencing sexual abuse. However, the uncontroverted evidence is that the dysfunctionality that permeates this family has not been from a single source. The undersigned counsel has been able to obtain records concerning both the sexual abuse that was adjudicated to have been inflicted upon the defendant by his father and the subsequent circumstances that warranted the defendant's placement in foster care. While the probation office accurately reports that at least during a preliminary hearing, the defendant had denied that his father touched him sexually, the original statement that the defendant gave to law enforcement contained explicit descriptions of the abuse the defendant had suffered, and his father was convicted of the offense. In PSR, ¶ 62-65, the probation report touches on these matters. The foster care recommendations for placement were intended to address the abuse by the father, and the mother's abusive behavior towards the defendant due to her

lack of protective capabilities. Her lack of protective capabilities resulted in additional abuse to the defendant at the hands of her husband and abusive boyfriends. In documentation provided by the undersigned counsel, the Recommendation and Permanency Plan indicated the scope of the dysfunctional circumstances that needed to be addressed in the dependency court. They are enumerated as follows:

1. **The family does not have resources to meet basic needs.**

    At this time, Sally McGuire does not have any sort of income at all. She does not have a job but has been looking for a job but has yet to find one. The individual that she is currently living with also does not have a job, nor does he have an income coming in. Sally has primarily depended on other men in her life for her source of income, thus leaving her in a vulnerable situation as she needs them to support herself and her children. I do think it is very important that Sally use her skills that she has to support herself and gains the strength to be able to support herself versus dependent men so that her children can be safe. I do think that her lack of follow-through on that has put her children in very risky situations as she's in a position where she needs the other individual even though he may be abusive to her and her children.

2. **One of both parents have failed to benefit from previous professional help.**

Sally McGuire has had in-home counseling services and also has had parent-aide services in her home. Both of these have ended with saying that there is a lot of work yet to be done and having follow-up conditions for the family to do. Sally knows what she needs to do in regard to protecting her children. Her ability to protect the children, I do believe, is questionable as she does not have the ability to financially support the children and not be dependent on them.

**3. One or both parents cannot control behavior and/or are violent.**

Sally McGuire is currently married to Mike Tillotson. Even though at this time she is saying he is not part of her life, she has fluctuated between dating him and dating Bryan and always seems to come back to Mike. Mike also has a lot of control over Sally's life, and I do not believe that he is out of the picture as she has not gained any strength to keep him away. Mike is very violent individual, per his past and also per the way the children report that were treated by Mike. The children report that Mike has hit them in the back of the head and John has been punched in the face by Mike, which led us to the situation. Even though Mike is involved in anger management, I do not nor have I seen anything that led me to believe that he is making progress in that group.

4. **One of both parents have rejected interventions.**

At this time Sally is being very compliant, but Sally had also shown that when she is with Mr. Tillotson that she is not compliant with Human Services and does everything to fight their involvement. Mike is very anti-Human Services, and he has openly acknowledged that Mike in the past has indicated that he will work with certain workers but has also shown that once those workers become confrontive to his behaviors, he no longer wants to work with Human Services. Mike also wants to work with Human Services when it is convenient for him and when he can do what he wants to do.

The conditions to return home included both individual counseling for Sally McGuire to address her protective capacities and keep the children from becoming victims of abuse once again. There was a requirement that Jesse Bertetto undertake individual counseling to address his issues with being a victim of sexual abuse. Jack Bertetto was not allowed any contact with Jesse at that time. Additionally, the report had an attached addendum indicating that Jesse's known medical problems included that he suffers from ADHD with hyperactivity and post-traumatic stress disorder. Unfortunately, the undersigned counsel has been unable to unearth any significant documentation that these recommendations concerning Jesse were followed in

any significant way. It is apparent from the history of this case as cited in the pre-sentencing report that the defendant was returned to his mother at some juncture and that the residential history from that point on became erratic. The defendant was moved to multiple locations and school districts and eventually relocated for short periods of time in multiple residences between California, Wisconsin, Minnesota, and then back to Wisconsin prior to his eventually settling in various locations in the state of Florida. A direct inquiry to his mother in Wisconsin indicated that she had retained no physical records confirming any mental health or sexual abuse treatment providers. A list of potential sources of schools and/or treatment records that she attempted to provide from memory was all that she was ever able to provide. The request for production of documents to potential sources of documentation provided scant evidence of any treatment other than the existence of an IEP. Clearly, the defendant could have benefited from early intervention and treatment, but the defendant has no recollection of any specific mental health or sexual victim treatment having been provided. As noted in the section above concerning therapist Lawrence Benes' evaluation and treatment of the defendant, the defendant would be amenable to sex offender treatment and therapy, but other than the therapy provided by Mr. Benes, the defendant to this day has never truly had the opportunity to engage in the aforementioned therapy and

9

treatment. Profound family dysfunctionality, abuse, and marginalization brings Mr. Bertetto before this court seeking an individualized sentence.

**V. Section 3553(a)(2)– The need for the sentence imposed.** Without question this offense is serious and deserves a just punishment to show respect for the law. The proposed sentence range is extremely punitive. Even with a significant downward variance of the guidelines, Mr. Bertetto will have sufficient time to receive training, education, vocational, sexual victim/offender therapy, and mental health treatment. Sentencing reforms acknowledge that over punishment for non-violent offenses will not benefit Mr. Bertetto or society. Guideline changes concerning first offenders have recently gone into effect. While admittedly these changes do not directly affect the specific charges for which Mr. Bertetto has been convicted, his lack of any prior criminal history should still be factored in as a relevant mitigating factor, especially when considered in conjunction with his diligent compliance with his pretrial release conditions.

The United States Sentencing Commission provides for recommended areas of focus in sentencing non-production child pornography offenders. In June 2021, the United States Sentencing Commission (USSC) published its report, *Federal Sentencing of Child Pornography: Non-Production Offenses*

("USSC's Report").² Of specific relevance to the sentencing considerations in this case is the USSC's examination of the three primary areas of focus in sentencing non-production CSAM offenders: (1) content; (2) community; and (3) conduct.

First, with respect to **content**, the USSC offers an analysis of "data regarding the content of the offender's child pornography collection and nature of the offender's collecting behavior. *Id.*, 28. One characteristic of this case is the large number of images, and data storage devices, identified by law enforcement as evidence in this case. Mr. Bertetto undoubtedly maintained a collection of contraband image files. However, there is no empirical evidence to suggest that the duration of viewing/collecting pornographic depictions of minors, the number of images possessed by an individual, or the type of image (e.g., penetration of a child under the age of twelve, sadism/masochism, bestiality, anime, etc.) is associated with increased risk for the commission of future offenses, either future possession of child sexual exploitation material or contact offenses.

Second, with respect to **community**, the USSC's Report directs consideration of the offender's degree of involvement with others in an internet community devoted to CSAM and child sexual exploitation. While the evidence

---

²https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

11

at trial indicated that Mr. Bertetto did engage in some communications with an online community of other offenders to access the images constituting his offense conduct, it is arguable that the relatively infrequent engaging in these communications should be considered in light of the technological changes that have made this type of contact much more prevalent in the average child pornography distribution case.

Third, with respect to **conduct**, the USSC's Report directs consideration of the offender's engagement in sexually abusive or exploitative conduct in addition to the CSAM offense, either during the instant offense or in prior history. In this case, there is no evidence suggesting that Mr. Bertetto engaged in conduct or communication that might be viewed as encouraging others to produce CSAM. Instead, Mr. Bertetto's conduct was limited to the downloading of CSAM and sending CSAM to other participants in the file sharing domain.

In accordance with the conclusion of the USSC Report:

*"The guideline covering the distribution, receipt, and possession of child pornography, §2G2.2, is largely the result of statutory mandatory minimum penalties, congressional directives to the Commission, and direct amendments to the guideline by Congress in the PROTECT Act of 2003. The Commission's 2012 Child Pornography Report recommended*

*that Congress authorize the Commission to revise §2G2.2 to eliminate outdated guideline enhancements and more fully account for relevant aggravating factors. Congress has not passed legislation amending either the statutory penalty scheme or the directives to the Commission. The guideline, therefore, remains largely intact. Although non-production child pornography offenses make up only a small portion of the federal caseload, interest in their penalty structure remains heightened because of the nature of these offenses, the harm to the victims, and their high variance rate compared to other federal offenses. This update to the Commission's 2012 Child Pornography Report is intended to provide Congress, judges, and other stakeholders with current information on non-production child pornography offenses and offender behavior. A central theme of the Commission's 2012 Child Pornography Report remains true today: the sentencing enhancements in §2G2.2 have not kept pace with technological advancements. Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often*

*depicting the youngest of victims. These factors are already accounted for in §2G2.2 by a series of enhancements that were initially added to target more serious offenses and more culpable offenders. However, the conduct covered by four of the six enhancements—accounting for a combined 13 offense levels—has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2. Conversely, significant aspects of an offender's collecting behavior, involvement in a child pornography community, and aggravating sexual conduct such as past or concurrent contact offenses may not be accounted for in the guideline at all. In short, the guideline is both overinclusive and underinclusive. Thus, it no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender. The inadequacies of the current penalty structure impact the sentencing practices of the courts and the charging practices of the government. Far fewer non-production child pornography offenders are sentenced within their guideline range under §2G2.2 compared to other federal offenders. Judges have continued*

*to sentence most non-production child pornography offenders below the guideline range, most often by imposing variances pursuant to their authority under 18 U.S.C. § 3553(a), but also increasingly at the request of the government. Furthermore, the government often limits the sentencing exposure of non-production child pornography offenders by reducing distribution and receipt charges, which carry mandatory minimum penalties of at least five years, to possession charges, which carry no mandatory minimum penalty. While courts are increasingly sentencing based on non-guideline factors, the key factors identified in the Commission's 2012 Child Pornography Report are reflected in sentencing practices in the aggregate. Consistent with the Commission's recommendations, offenders who participated in an online child pornography community or engaged in aggravating conduct received longer sentences than offenders who did not engage in such conduct. Furthermore, the offenders who engaged in the more serious conduct also were significantly more likely to receive a sentence within their applicable guideline range and less likely to receive a*

*downward variance. A more granular analysis revealed, however, significant sentencing disparities among similarly situated offenders as courts and the government contend with the outdated statutory and guideline structure. The analysis shows pervasive sentencing disparities not only between similarly situated offenders convicted of possession and offenders convicted of receipt, but also among similarly situated possession offenders as a distinct group and similarly situated receipt offenders as a distinct group. Charging practices, the resulting guideline ranges, and sentencing practices of judges all contributed to some degree to these disparities. Therefore, even though the key factors identified in the 2012 Child Pornography Report influence sentences, they cannot be considered in a sufficiently uniform manner in the absence of a properly calibrated guideline that jettisons outdated factors."*

The Commission's recommendations apply to the instant case in several sections. In PSR, ¶ 44, the defendant received a two-level increase under specific offense characteristics for the offense including the use of a computer or other interactive service. While the evidence at trial was that the defendant

had done so, this is a classic example where the sentencing enhancement under §2G2.2 has not kept pace with the technology advances and the enhancement has become so ubiquitous that they now apply in the vast majority of cases sentenced until § 2G2.2. Under these circumstances, the enhancement does not truly distinguish between more or less culpable offenders. The PSR likewise gave an additional five-level enhancement for as in PSR, ¶ 45, as it involved 600 or more images pursuant to U.S.C §2G2.2(b)(7)(D). This is another example of when the changes in technology have increased the likely number of images an offender may possess, and the enhancement does not truly distinguish before more or less culpable offenders.

As the use in technology in file sharing applications has become increasingly prevalent, this arguably no longer distinguishes between more or less culpable offenders. This references to the changes in technology have changed the overall landscape for the average case. This analysis applies equally in specific offense characteristics in PSR, ¶ 41-42. Therefore, the defendant urges the Court to consider each of the specific sentencing characteristics enhancements in this context and urges the Court to consider appropriate downward variants considering the analysis in the sentencing Commission's Recommendations.

## VI. Section 3553(a)(2)(B) – adequate deterrence to criminal conduct.

The proposed sentence range will reasonably deter Mr. Bertetto from committing future crimes. Mr. Bertetto will know if he violates during the period of supervised release this court can impose the remaining portion of his sentence in prison.

### VII. Section 3553(a)(2)(C) – protecting the public from further crimes of the defendant.

The proposed sentence will protect the public. Mr. Bertetto is a first offender who has demonstrated that he can comply with restrictive conditions of community release that will reduce his likelihood of recidivism. The proposed sentence range will remove him from the community for a sufficient punishment and avoid excessive costs to society. Probation reports the cost on society to incarcerate Mr. Bertetto is $49,770.00 a year. PSR ¶105.

### VIII. Section 3553(a)(2)(D) – provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

The sentencing goals require punishment no longer than necessary to rehabilitate and re-integrate Mr. Bertetto safely in the community. He clearly needs a sentence that will allow rehabilitation and hopefully significant sex offender/mental health treatment in Bureau of Prisons and after care upon his release, vocational skills, and counseling. A significantly reduced sentencing range would achieve that purpose.

Additionally, it should be taken into consideration that there will be a substantial amount of restitution likely ordered by this Honorable Court, and a significantly reduced sentence would facilitate that goal.

## CONCLUSION

For the reasons set forth above, a sentence that is a substantial variance from the low-end of Mr. Bertetto's applicable sentencing guidelines as calculated by the Court, followed by an appropriate term of supervised release, would be sufficient but not greater than necessary to comply with the purposes of sentencing and satisfy the application of the factors enumerated in 18 U.S.C. § 3553(a).

Respectfully submitted,

**/s/ Scott L. Robbins**
SCOTT L. ROBBINS, ESQUIRE
Counsel for Defendant
**JESSE JAMES BERTETTO**

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing has been filed electronically with the Clerk of the Court by using the CM/ECF system on November 2, 2023.

**/s/ Scott L. Robbins**
SCOTT L. ROBBINS, ESQUIRE
Counsel for Defendant
**JESSE BERTETTO**
3302 N. Tampa Street
Tampa, Florida 33603
(813) 258-2909
FL. Bar No.: 0352111
scott@mytampafirm.com
scott@scottrobbinslaw.com